John Colan (D.C. Bar No. 1011310)
SINOBERG RAFT
1754 Corcoran Street NW, Apt 56R
Washington, DC  20009
Telephone:   1 (804) 513-1566
Email:        John.Colan@SinobergRaft.com

*Proposed Counsel to the Debtors*

Lisa Laukitis (*pro hac vice* pending)
Benjamin M. Schak (*pro hac vice* pending)
Avi Taub (*pro hac vice* pending)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Telephone:   1 (212) 530-5000
Email:        LLaukitis@Milbank.com
              BSchak@Milbank.com
              ATaub@Milbank.com

*Proposed Counsel to The Jerk Pit, LLC*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In re* <br> **LISA NASH** d/b/a The Jerk Pit *et al.*,[1] <br><br> Debtors. | Case No. 25-00097 (ELG) <br><br> Chapter 11 <br><br> (Joint Administration Requested) <br><br> (Expedited Consideration Requested) |

# MOTION OF THE JERK PIT FOR
# ENTRY OF INTERIM AND FINAL ORDERS
# (I) AUTHORIZING IT TO USE CASH COLLATERAL
# AND (II) GRANTING ADEQUATE PROTECTION

---

[1]    The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the federal tax identification number and address of each one, are Lisa Nash (xxx-xx-2750, at 6510 Park Hall Drive, Laurel, MD 20707); and The Jerk Pit, LLC (56-2486016, at 9078 Baltimore Ave., College Park, MD 20740).

The Jerk Pit, LLC ("***The Jerk Pit***"), as one of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), respectfully states as follows.

## RELIEF REQUESTED

1.     By this motion (the "***Motion***"), The Jerk Pit seeks entry of an order, authorizing it to use cash collateral in which certain lenders and financing providers may assert interests. A proposed form of order granting this relief on an interim basis (the "***Proposed Interim Order***") is attached to this Motion as **Exhibit A-1**, and a proposed form of order granting this relief on a final basis (the "***Proposed Final Order***" and, together with the Proposed Interim Order, the "***Proposed Orders***") is attached as **Exhibit A-2**.

2.     The principal statutory bases for this Motion are sections 105(a), 363 and 503(b) of title 11 of the U.S. Code (the "***Bankruptcy Code***"), Rule 4001(b) of the Federal Rules of Bankruptcy Procedures (the "***Bankruptcy Rules***"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Columbia (the "***Local Rules***").

3.     Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2, the following chart contains a summary of the material terms under which the Debtors propose to use cash collateral:

| Summary of Material Terms | |
|---|---|
| **Entities with an interest in cash collateral** (B.R. 4001(b)(1)(B)(i)) | Secured lenders:<br>• U.S. Small Business Administration ("***SBA***")<br>• Washington Area Community Investment Fund ("***Wacif***")<br>• Celtic Bank<br>• WebBank[2]<br>Parties that have purported to purchase certain receivables (the "***Cash Advance Lenders***"):<br>• Capitalize Group LLC<br>• First Data Merchant Services LLC d/b/a Clover Capital<br>• Fox Funding Group LLC<br>• Parafin, Inc. |
| **Insider relationship** (L.B.R. 4001-2(a)(1)(i)) | None. |

---

[2]     WebBank entered into a financing transaction with Lime Cay Inc., but may assert an interest in cash held by The Jerk Pit.

| **Summary of Material Terms** | |
|---|---|
| **Estimated prepetition debt** (L.B.R. 4001-2(a)(1)(v)) | See **Exhibit C-1** (with respect to financing arrangements that are denominated as loans) and **Exhibit C-2** (with respect to financing arrangements that are denominated as sales of receivables). These exhibits include certain financing arrangements entered into by Lime Cay Inc., which operates the Adams Morgan location of the "Jerk Pit" business. |
| **Description and source of collateral** (L.B.R. 4001-2(a)(1)(ii)-(vi)) | The Jerk Pit, LLC and Lime Cay Inc. (the "***Business Entities***") maintain bank accounts and hold cash, much of which consists of the proceeds of receivables from various transaction processors. These receivables arise in the ordinary course of business from in-store and online transactions, and have been pledged or sold, at least in part, to the SBA, Celtic Bank, WebBank, and the Cash Advance Lenders. Additionally, the SBA, Capitalize Group, and possibly Celtic Bank assert security interests in a broad range of personal assets of the Business Entities, including assets that may constitute cash collateral. |
| **Purpose for use of cash collateral** (B.R. 4001(b)(1)(B)(ii)) | Working capital and general business purposes, including payroll and food purchases. |
| **Material terms and duration of use** (B.R. 4001(b)(1)(B)(iii)) | Authorization to use cash collateral (except to pay the Carve-Out described below) terminates upon conversion to chapter 7. No express limit on duration. |
| **Cash flow projection** (L.B.R. 4001-2(a)(1)(iii)) | Attached to this Motion as **Exhibit B**. |
| **Adequate protection** (B.R. 4001(b)(1)(B)(iv)) | The Jerk Pit proposes to grant:<br><br>(a) administrative claims, with priority over all other administrative claims, against The Jerk Pit in (i) the amount of diminution in value of their respective valid, perfected, unavoidable interests in assets used by The Jerk Pit, resulting from The Jerk Pit's use of such assets in these Chapter 11 Cases, *minus* (ii) the amount properly chargeable to such interests under section 506(c) of the Bankruptcy Code,<br><br>(b) replacement liens on The Jerk Pit's postpetition receivables and proceeds thereof ("***Adequate Protection Liens***") to the extent of such administrative claims, and<br><br>(c) $1,562.50 in monthly payments to the SBA (representing the approximate amount of monthly interest).<br><br>The Adequate Protection Liens will be junior to the Carve-Out (described below) and to any prepetition security interests. |
| **Carve-out** (L.B.R. 4001-2(a)(1)(iv)(F)) | As set forth in the Proposed Orders, the Adequate Protection Liens and the SBA's and Cash Advance Lenders' prepetition liens will be subject to a carve-out (the "***Carve-Out***") to pay the approved fees and expenses of the Debtors and any trustee that may be appointed, as well as mandatory court costs. Because the Debtors are represented by pro bono legal counsel, the Debtors do not anticipate that their advisors will contribute a significant amount to the Carve-Out. |
| **Disclosure of extraordinary terms** (L.B.R. 4001-2(a)(1)(iv)) | None. |

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This case has been referred to the Court pursuant to 28 U.S.C. § 157(a) by Local Bankruptcy Rule 5011-1(a)

of the Rules of the United States District Court for the District of Columbia (Jan. 2024). This Motion is a core proceeding under 28 U.S.C. § 157(b). Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PRELIMINARY STATEMENT

5.      These Chapter 11 Cases present a classic example of the problems that chapter 11 and the Small Business Reorganization Act (codified as subchapter V of chapter 11) were designed to solve. In its College Park location, The Jerk Pit is a proven local restaurant that has served meals, created jobs and produced profits for almost two decades. Yet it has been burdened in recent months by a series of egregious financings that funded its recent expansion into Washington, DC. Since then, The Jerk Pit's consolidated financial position has deteriorated and it has struggled to keep up with payments, as business at the new location has grown slower than expected. To make matters worse, two of the financing providers begin to exercise remedies in recent months, by instructing payment processors to freeze and sweep those funds. Against this backdrop, Ms. Nash, as the founder and sole owner of both business entities, has made the painful decision to cease operations at the Washington location, which cannot reasonably be expected to turn a profit during these Chapter 11 Cases. She remains confident, however, that, with a short breathing spell and the assistance of this Court, the College Park business can maintain normal profitable operations, pay off far more debt than would be possible in a liquidation, and continue to provide jobs and food to the College Park community that it serves.

6.      The Business Entities' legal position and capital structure is complex, relative to the scope of their operations. In theory, the College Park restaurant is operated by The Jerk Pit, and the Washington location is operated separately by Lime Cay Inc. ("*Lime Cay*"). In practice, however, many aspects of the two entities' finances have been commingled, and it may be difficult to separate them. Creditors have begun to exercise remedies against receivables generated by Lime Cay, and the combined company's tight liquidity position has forced management to make payments to vendors and employees from whichever entity's account has had available funds.

7.      The Business Entities' capital structure consists of several loans and other financing transactions. As summarized on **Exhibits C-1** and **C-2**, the SBA holds a secured long-term loan, with security over a wide range of the personal property of The Jerk Pit (including its receivables). Another business loan to The Jerk Pit, extended by Wacif may also be secured. More recently, both Business Entities funded the Washington expansion by entering into several transactions through which they pledged or (purportedly) sold portions of their receivables. These transactions include two agreements styled as "loan agreements" with affiliates of the Stripe and Toast payment processors, as well as a series of "merchant cash advance" transactions. These merchant cash advances purport to be sales of current and future receivables, at staggering discounts. For instance, last September's cash advance from Capitalize Group LLC ("*Capitalize*") provided just $67,500, but allowed Capitalize to recover $112,500 from receivables over a period that was projected to extend just over five months. Thus, Capitalize's financing inflicts an effective annual interest rate of *over 800%*.

8.      The Debtors do not believe that these "merchant cash advances" are sales at all. They are disguised loans, and the lenders (the "*Cash Advance Lenders*") are as likely to deserve clawback liability (on grounds of usury, avoidable preference or both) as to deserve distributions. Indeed, even if the cash advances are true sales, many or all of them are likely to be constructively fraudulent conveyances that transformed a thriving business into one that could not regularly pay its debts. These are, however, issues for another day, along with questions related to substantive consolidation, the relationships among the Debtors, and the proper calculation of loan claims as of the petition date. For present purposes, the reality is that The Jerk Pit needs access to its receivables so that it can survive long enough to straighten out its finances and propose a subchapter V plan that delivers meaningful value to creditors.

9.      Despite the complexity of the prepetition capital structure, the *post*-petition situation is simple. <u>First</u>, the SBA has a senior lien on most of the prepetition assets of The Jerk Pit, including all of its prepetition receivables. The SBA's claim is likely to be undersecured, such that the SBA is entitled to adequate protection against diminution in the value of its collateral. <u>Second</u>, the Cash Advance Lenders have junior interests of some kind in certain of the prepetition

receivables (and, in some cases, in other assets). They are likely to be fully unsecured claimants, and therefore not entitled to adequate protection. Nevertheless, to avoid a distracting valuation fight at the outset of this subchapter V case, The Jerk Pit will provide adequate protection in the form described below. *Third*, none of these creditors has any interest in receivables that are generated from The Jerk Pit's postpetition activities. Section 552 of the Bankruptcy Code cuts off security interests upon the filing of a bankruptcy petition, and these receivables are not proceeds of prepetition collateral. Furthermore, as discussed below, the prepetition Debtors could not have legally sold the estates' postpetition receivables prior to the petition date, both because the postpetition receivables did yet not exist and because no such sale could have been authorized by the Court.

10.     The Jerk Pit is proposing to use cash collateral while providing three forms of adequate protection to secured creditors. *First*, pursuant to section 507(b) of the Bankruptcy Code, The Jerk Pit proposes that the SBA and the Cash Advance Lenders will receive an administrative claim, with priority over all other administrative claims, in the amount of the diminution in value of their respective valid, perfected, unavoidable interests in the Debtors' assets, resulting from The Jerk Pit's use of such assets in these Chapter 11 Cases, *minus* (ii) the amount properly chargeable to such interests under section 506(c) of the Bankruptcy Code. (If the Cash Advance Lenders are presently unsecured, then this amount will obviously be $0.00, since their collateral has no value to diminish.) *Second*, The Jerk Pit proposes to grant replacement liens, to the extent of such administrative claims, on all assets of The Jerk Pit's estate, including postpetition receivables and proceeds thereof. The Adequate Protection Liens will be junior to the Carve-Out (described below) and to any valid and unavoidable prepetition security interests.[3]

---

[3]     Through this Motion, the Debtors do not seek, in any way, to limit, subordinate or waive any rights or priorities of claimants with trust rights under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("**PACA**") or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181 *et seq.* ("**PASA**"), or in any way to grant liens or other rights in the res of any PACA trust or PASA trust in a manner that is contrary to PACA or PASA.

11.     These forms of adequate protection are sufficient to guard against diminution of collateral value. As of the petition date, the Business Entities were entitled to approximately $130,000 of receivables.[4] Of these, approximately $70,000 will be used in the first week of the Chapter 11 Cases to catch up on specific urgent payments that will allow operations to continue beyond the end of May. Aside from those payments, Jerk Pit's stand-alone cash flows are expected to remain positive or neutral through the Chapter 11 Cases, generating revenue of $62,000 to $72,000 per week and a constant stream of cash and receivables. Other collateral, such as food and equipment, will likewise be replenished in the ordinary course of The Jerk Pit's operations.

12.     For these reasons, the Court should grant the Debtors' motion to allow The Jerk Pit to use its prepetition receivables, and the cash proceeds thereof, on the terms proposed.

## THE JERK PIT'S CAPITAL STRUCTURE

### I.      THE BUSINESS LOANS

13.     The Jerk Pit is party to two traditional business loans: one with the federal government and another with a local non-profit investment fund.

### A.      Small Business Administration

14.     In March 2022, The Jerk Pit borrowed $500,000 from the U.S. Small Business Administration, an independent agency of the federal government. This loan is secured by personal property, including inventory, equipment and accounts (including credit card receivables). The SBA filed a UCC-1 financing statement on March 7, 2022.

15.     The SBA loan bears interest at 3.75% per annum. No payments were due under the SBA loan for the first 24 months. After that period, the loan was scheduled to be repaid through monthly payments of $2,575 for the following 28 years (336 months).

---

[4]   The amounts to be collected from The Jerk Pit's College Park location and Lime Cay's Adams Morgan location are not easily separable.

### B.      Wacif

16.     The Jerk Pit also received an SBA-sponsored loan from the Washington Area Community Investment Fund, on which approximately $35,965.11 remains outstanding. The terms of this loan and the existence and perfection of a security interest are subject to further diligence.[5]

## II.    THE LOANS ON RECEIVABLES

17.     Both The Jerk Pit and Lime Cay are party to receivables financings that are characterized as "loan agreements" on their face.

### 1.      *Stripe*

18.     On June 5, 2024, The Jerk Pit executed an 18-month loan with Celtic Bank, which is an affiliate of the "Stripe" payment processor that The Jerk Pit uses for certain transactions. The initial loan balance was $24,918, consisting of $15,464.29 in new money, a rollover of a prior $6,035.71 loan balance, and a $3,418 "fixed fee" (which the Debtors believe constitutes original issue discount). The maturity date is December 4, 2025, with minimum payments of $2,768.67 due every 60 days. Additionally, the loan agreement permits Celtic's processor affiliate to remit 20% of each day's receipts to the lender until the loan is repaid. No amount is expressly denominated as "interest," but the "loan fee" ensures that Celtic Bank receives an effective interest rate of at least 20.1% (assuming no payments other than the minimum payments).

19.     The Stripe loan is secured by, among other things, receivables and "all business assets" of The Jerk Pit, although it is unclear whether Celtic Bank has filed a UCC-1 financing statement to perfect any aspect of this pledge.

### 2.      *Square*

20.     On December 27, 2024, The Jerk Pit executed a similar transaction with Square Financial Services, Inc. ("**Square**"), an affiliate of another payment processor. Details concerning

---

[5]   Wacif personnel have asserted that Wacif's loan is secured, and Wacif's standard loan form contains language regarding security and the filing of a UCC-1 financing statement. However, no financing statement was apparent on the face of Maryland search results for The Jerk Pit.

this loan are presented on **Schedule C-1**. The Square loan agreement includes provisions regarding a security interest, but expressly states that these provisions apply only if the "Loan Amount" is above $75,000. Since the stated loan amount is only $30,645, the Square loan is unsecured.

### 3.   *Toast*

21.    Lime Cay is party to a similar loan with WebBank, an affiliate of the "Toast" payment processor that it uses. The initial loan balance was $20,265, consisting of $19,300 of principal and a $965 "fixed fee." The maturity date is no later than 150 days after the loan date, with regular payments in the amount of 13.2% of receipts through the "Toast" system.

22.    The WebBank loan is secured by receivables of Lime Cay and their proceeds. WebBank has filed a UCC-1 financing statement against The Jerk Pit, but does not appear to have filed a financing statement against the Lime Cay.

### B.   The Merchant Cash Advances

23.    The Business Entities have also entered into a series of financing transactions with the Cash Advance Lenders, which the Cash Advance Lenders call "merchant cash advances." These transactions are structured similarly to each other. In each transaction, one or both of the Business Entities agrees to sell a fixed percentage of its future receivables,[6] up to a fixed dollar amount, in exchange for a much lower amount of up-front cash.

24.    Although described as a sale of receivables, no specific receivables are identified as corresponding to the transaction, as might be the case under a traditional receivables factoring facility. Instead, the notional purchaser "owns" the specified percentage of all receivables, whenever and however they might arise, until the "purchase amount" has been paid in full. If, for whatever reason, a payment processor fails to fulfill its payment obligation to the "seller" on one day, the Cash Advance Lender can simply recoup its investment from another payment processor or from the same processor on the next day.

---

[6]    Throughout this Motion, we use the familiar word "receivables" interchangeably with the more technical word "accounts" that is used in both the Uniform Commercial Code and the Bankruptcy Code.

25.    Many of the Cash Advance Lenders' investments are even more distant from the receivables than the foregoing description might suggest. Although the Cash Advance Lenders have purported to purchase a variable stream of payments that depend on the Business Entities' revenue flow, several of the agreements provide for the Cash Advance Lender to receive a fixed periodic remittance (either specified in the cash advance agreement or determined by the purchaser), until one of the parties demands a reconciliation between the actual receivables and the remittances, supported by reports of historical receivables. No party has sought a reconciliation or adjustment, and the Business Entities typically may not demand a reconciliation or adjustment following an event of default.

26.    Following an event of default, the Cash Advance Lender may declare the full remaining amount (i.e., the dollar amount of the allegedly purchased receivables, minus any payments to date) to be payable and may enforce a claim in that amount against the applicable Debtor or Debtors. The transaction agreements provide that the Cash Advance Lender possesses a lien over the applicable Debtor's receivables and their proceeds, and in some instances over a broader array of personal property.

27.    A summary of the outstanding cash advances is set forth on **Exhibit C-2**. As alluded to in the Preliminary Statement, the cash advance from Capitalize is typical. Last September, Capitalize entered into a "Standard Merchant Cash Advance Agreement" with The Jerk Pit as "Merchant" and Lisa Nash as "Guarantor." After deducting various fees, Capitalize paid "Net Funds Provided" in the amount of $74,400 to The Jerk Pit, much of which represented a rollover of previous advances. Capitalize received rights to a "Receivables Purchased Amount" of $200,000, representing 10.00% ownership of unspecified future receivables. In the absence of an adjustment or reconciliation, Capitalize was scheduled to receive a weekly "Estimated Payment" of $1,043.48 per business day. This schedule meant that Capitalize could anticipate payment of

$120,000.00 (or a 61% return on capital) in just over 5 months, carrying a mind-boggling effective annual interest rate of *over 800%*.[7]

28.     The Debtors reserve all rights to seek additional relief with respect to these cash advance transactions, including a declaration characterizing the transactions as loans, a declaration that the loans are unlawfully usurious, avoidance of historical transfers to the Cash Advance Lenders on grounds of usury, avoidance of historical transfers to the Cash Advance Lenders as preferences under section 547 of the Bankruptcy Code, avoidance of any "sale" and the accompanying guarantees as fraudulent conveyances under section 548 of the Bankruptcy Code, nonbankruptcy law or both, avoidance of any "sale" as unperfected under section 9-318 of the applicable enactment of the Uniform Commercial Code, a contractual or equitable accounting of historical transfers to the Cash Advance Lenders as compared to the actual receipts of each applicable restaurant location, and any necessary enforcement of the automatic stay of section 362 of the Bankruptcy Code.

## BASIS FOR RELIEF

29.     The Court need not characterize the cash advance transactions as loans or true sales in the context of this Motion, for two points are unquestionably true. _First_, the Cash Advance Lenders' interests in The Jerk Pit's _pre_-petition receivables are junior to the SBA's prior perfected lien. _Second_, the filing of the Debtors' voluntary petitions cut off any interest that either the SBA or the Cash Advance Lenders might have had in the estates' _post_-petition receivables.

## I.     THE CASH ADVANCE LENDERS' INTERESTS IN PREPETITION RECEIVABLES ARE COMPLETELY UNDERWATER.

30.     As described above, the SBA extended a $500,000 loan to The Jerk Pit in early 2022, which accrued an even greater balance during the two first years, during which was interest accrued without being paid in cash. That loan was secured by a comprehensive personal-property

---

[7]     Even if the stream of receivables had been _ten times slower_ than expected—so that Capitalize received only $104.35 per day instead of $1,043.48—the full $120,000 obligation would have been paid in approximately 4 years and 6 months, at a still-usurious effective interest rate of approximately 26%.

lien on, among other things, all "accounts, including . . . credit card receivables," and proceeds thereof. The SBA appears to have perfected its lien in March 2022, through the filing of a UCC-1 financing statement in Maryland (attached as **Exhibit D**). Furthermore, nothing in the SBA's loan documents (attached as **Exhibit E**) expressly provides for a release of its lien upon a sale of The Jerk Pit's receivables.

31.     Because the merchant cash advance transactions took place long after the SBA perfected its lien, the Cash Advance Lenders' interests are subordinate to that lien. *Cf. In re De Franco*, 93 B.R. 307, 308 (Bankr. D.D.C. 1988) (treating junior lender as unsecured where SBA held an undersecured senior lien). If the Cash Advance Lenders purchased the subject receivables, then they purchased the receivables subject to the SBA's lien. *See* Md. Comm. Law Code § 9-317(d) ("[A] buyer, other than a secured party, of collateral other than [certain types of assets not relevant here] takes free of a security interest if the . . . buyer gives value without knowledge of the security interests and ***before it is perfected***." (emphasis added)). If, on the other hand, the Cash Advance Lenders took liens on the subject receivables, then their liens are again junior. *See id.* § 9-322(a)(1)-(2) (providing that a perfected security interest has priority over a later-perfected or unperfected security interest).[8]

32.     The SBA's loan, by itself, represents a senior secured claim of just over $500,000, secured by a collateral package that includes the receivables of The Jerk Pit. The combined financial statements of the Business Entities, filed with their petitions, show banking assets of just $24,021. Even if The Jerk Pit's pending receivables and physical assets (cutlery, kitchen utensils, menus and so forth) hold some value, it is doubtful that the business's value is sufficient to exceed the SBA's claim. Accordingly, any interest that the Cash Advance Lenders might possess in the receivables of The Jerk Pit has no value whatsoever.

33.     The Cash Advance Lenders are likely to be completely unsecured creditors (or perhaps "owners" of receivables that are worth nothing to them, by virtue of being completely

---

[8]   This is true even for the Cash Advance Lenders that engaged in transactions with Lime Cay Inc., insofar as most of the DC location's receipts have been paid into accounts belonging to The Jerk Pit, LLC.

encumbered by the SBA's loan), the Cash Advance Lenders are not entitled to any protection of their interests whatsoever. *See, e.g.*, *In re SunEdison, Inc.*, 562 B.R. 243, 252 (Bankr. S.D.N.Y. 2017) ("Unsecured creditors . . . do not have an interest in property of the estate that merits adequate protection . . . ."). At most, the Cash Advance Lenders have a kind of contingent interest in the possibility that the SBA's lien might be avoided or satisfied during these Chapter 11 Cases. To the extent any such speculative interest is cognizable at this stage, The Jerk Pit's proposal adequately protects that interest by granting the Cash Advance Lenders a super-priority administrative claim and a replacement lien on postpetition assets, solely to the extent that they can later prove that the value of their interest was diminished through The Jerk Pit's use of collateral.

## II.    THE ESTATES' POSTPETITION RECEIVABLES ARE UNENCUMBERED.

### 1.    *Prepetition Creditors Have No Lien on Postpetition Receivables.*

34.    Outside bankruptcy, a business may grant a lien on after-acquired property, including future receivables. In bankruptcy, the case is altered: section 552(a) of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any [prepetition] security agreement," 11 U.S.C. § 552(a), a codification of the longstanding rule "there can be no lien upon something which does not exist at the time of the adjudication." *Sims v. Jamison*, 67 F.2d 409, 411 (9th Cir. 1933); *accord Local Loan Co. v. Hunt*, 292 U.S. 234 (1934) (holding that a purported lien over an individual's future earnings is cut off by an adjudication of bankruptcy). Thus, courts have routinely found that prepetition security interests do not extend to a debtor's postpetition receivables, which constitute property of the debtor's estate. *See, e.g.*, *Fin. Oversight & Mgmt. Bd. v. Andalusian Global Designated Activity Co.* (*In re Fin. Oversight & Mgmt. Bd.*), 948 F.3d 457, 471 (1st Cir. 2020); *Dobin v. Presidential Fin. Corp.*, (*In re Cybridge Corp.*), 304 B.R. 681, 689 (Bankr. D.N.J. 2004); *In re Tex. Tri-Collar, Inc.*, 29 B.R. 724, 726 (Bankr. W.D. La. 1983).

35.    The only exception to this bright-line rule is that a creditor's prepetition security interest may extend to postpetition "proceeds, products, offspring, or profits" of the creditor's prepetition collateral, 11 U.S.C. § 552(b)(1), "rents" of prepetition property, § 552(b)(2), and "fees,

charges, accounts, or other payments" for the use of hotel and motel rooms, *id.* In applying this rule, the same section of the Bankruptcy Code calls on a bankruptcy court to limit the extent of a postpetition lien on proceeds when the "equities of the case" demand it—for instance, when a business's revenue derives from a combination of encumbered and unencumbered business assets. § 552(b)(1)-(2); *see In re De Franco*, 93 B.R. 307, 309 (Bankr. D.D.C. 1988) (applying the "equities of the case" rule to deny a lien over post-petition rent payments where lender's capital did not contribute to production of rental income).

36.    The "proceeds" exception of section 552(b) might be thought relevant with respect to those creditors that hold liens on The Jerk Pit's food inventory.[9] However, revenues that derive from labor or services cannot constitute proceeds of inventory collateral. *See In re Skagit Pac. Corp.*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004) ("Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest."). Thus, in cases involving food and beverage service, courts have often rejected lenders' arguments that post-petition receivables are "proceeds" of restaurant inventory because, "[i]n comparison with food wholesalers and retailers who sell food products in their natural or packaged state, restaurants expend a great deal of time and energy preparing individual food orders by transforming these natural or packaged foods into menu items." *In re Inman*, 95 B.R. 479, 480-481 (Bankr. W.D. Ky. 1988); *see also In re Days Cal. Riverside L.P.*, 27 F.3d 374 (9th Cir. 1994) (rejecting lender's argument that a hotel's revenue from food constituted "rents" under pre-1994 version of § 552); *Timothy Dean's, Inc. v. White* (*In re Timothy Dean Rest. & Bar*), 342 B.R. 1, 24 (Bankr. D.D.C. 2006) (rejecting lender's argument that postpetition room service changes constituted "proceeds" of hotel's food inventory). And even if some small portion of a restaurant's revenues (perhaps an amount equal to the cost of goods) can be said to derive directly from food, courts have applied the "equities of the case" exception with special rigor in the restaurant context to prevent lenders from receiving windfall security interests in revenues that derive from the restaurant's postpetition services. *See In re Cafeteria Opers., L.P.*, 299 B.R. 400, 410 (Bankr. N.D. Tex. 2003) (finding that prepetition

---

[9]    Specifically, the SBA, Capitalize Group, and possibly Celtic Bank.

security interest "does not flow to all cash generated by Debtors, since all the cash is not proceeds of . . . inventory, but instead represents, in large part, the proceeds of Debtors' post-petition toil and effort"); *accord In re Strick Chex Columbus Two, LLC*, 542 B.R. 914, 919-920 (Bankr. N.D. Ga. 2015).

37.    Applying the restaurant cases to *this* restaurant case, the correct result is the SBA and the relevant Cash Advance Lenders have no interests in The Jerk Pit's postpetition receivables. In the alternative, if the Court finds that the postpetition receivables are, to some extent, "proceeds" of The Jerk Pit's prepetition food inventory, then the postpetition lien of the relevant lenders should be limited to the (small) portion of each receivable that represents the cost of goods.

## 2.    *The Cash Advance Lenders Cannot Have Purchased the Estates Postpetition Receivables from the Prepetition Debtors.*

38.    For similar reasons, the Cash Advance Lenders have no interest in any receivables that The Jerk Pit generates after the commencement of the Chapter 11 Cases, **even if** the cash advance transactions are characterized as sales. A recent case from the Southern District of Indiana scrutinized a merchant cash advance transaction similar to the transactions at stake here. *In re Watchmen Sec. LLC*, Case No. 24-00087-JMC-11, 2024 Bankr. LEXIS 2871 (Bankr. S.D. Ind. Nov. 20, 2024). In that case, the court proceeded from the same premise that underlies section 552 of the Bankruptcy Code: "a putative sale of rights to payment that do not yet exist . . . is both a metaphysical and legal impossibility." *In re Watchmen*, at *10 (quoting John F. Hilson & Stephen L. Sepinuck, *A "Sale" of Future Receivables: Disguising a Secured Loan as a Purchase of Hope*, 9 Transactional Lawyer 14, 15 (2019)). Although a person can sell as *existing* right to a *future* payment, the law has never recognized an attempt to sell a future right to payment. *See T.B. Harms & Francis, Day & Hunter v. Stern*, 229 F. 42, 49 (2d Cir. 1915) (refusing to recognize a purported sale of "all compositions which [a party] 'might write'" within five years), *vac'd on other grounds*, 231 F. 645 (2d Cir. 1916). Instead, "equity has long recognized such a purported transfer as an agreement or promise to transfer as an agreement or promise to transfer when the capacity to transfer arises . . . ." *Stathos v. Murphy*, 26 A.D.2d 500, 503 (N.Y. App. Div. 1st Dep't 1966). For this reason, the *Watchmen* court concluded that the prepetition debtor's purported sale of post-

petition receivables (if it was a true sale at all) would constitute an "unauthorized post-petition transfer of estate property" that would be "avoidable pursuant to 11 U.S.C. § 549" and "fully disallowable pursuant to 11 U.S.C. § 502(d)." *In re Watchmen*, at *19.

39.    Applying the same analysis here, the Cash Advance Lenders have not purchased any postpetition receivables of the estates, even assuming that the cash advances were true sales. The Cash Advance Lenders gained—at most—a contractual right to require their respective counterparties to convey receivables in the future. Now that the Debtors cannot honor that contractual obligation (since any such transfer would violate section 549 of the Bankruptcy Code), each Cash Advance Lender may assert a claim, which may even be secured, to the value of their prepetition collateral.

## III.   THE JERK PIT SHOULD BE PERMITTED TO USE CASH COLLATERAL TO FUND THEIR OPERATIONS.

40.    The Debtors are proposing to use cash collateral while providing three forms of adequate protection to the SBA and the Cash Advance Lenders: (a) super-priority administrative claims in the amount that the SBA and the Cash Advance Lenders are entitled to under section 507(b) of the Bankruptcy Code, (b) replacement liens to the extent of those administrative claims on all assets of The Jerk Pit, including postpetition receivables and proceeds thereof; and (c) cash payments to the SBA.

41.    These forms of adequate protection are sufficient. As of the petition date, The Jerk Pit is entitled to receivables in the total amount of approximately $130,000, mainly from DoorDash. As reflected in the projections on **Exhibit B**, The Jerk Pit intends to use these funds for two immediately critical purposes:

- Daria Land Group, is the landlord of The Jerk Pit's College Park location under a commercial lease between itself and Ms. Nash. Daria Land Group has already filed a motion in Ms. Nash's Chapter 11 Case to lift the automatic stay, on account of unpaid rent for April and May that Daria believes is due under section 365(d)(4) of the Bankruptcy Code. *See In re Nash*, Dkt. No. 34. Furthermore, regardless of the merits of Daria's motion, it is undisputed that the lease is scheduled to expire on May 31, 2025. Daria has expressed willingness to settle its motion and extend the lease by sufficient time to allow these Chapter 11 Cases time to proceed, but The

Jerk Pit anticipates that such an extension will require an up-front payment of three months' rent, or $27,600.

- The restaurant's liquor license and catering license have expired, and their renewal deadline has been extended only as far as the end of May. Beyond the direct renewal costs (approximately $5,100), approximately $38,000 in overdue sales and payroll taxes must be paid to tax authorities as a condition to renewing the liquor and catering licenses.[10]

42. After these initial "breathing room" expenses, The Jerk Pit's cash flows are expected to remain neutral or positive through the Chapter 11 Cases. These operational projections are not idle speculation, but are supported by a decade-long history of profitability at the College Park location. Other prepetition collateral, such as food and restaurant equipment, has minimal value relative to the scope of the operations, and will in any case be replenished throughout the Chapter 11 Cases. Accordingly, the aggregate value of the prepetition collateral, in combination with the postpetition collateral, is likely to remain constant (or even increase).

43. The Jerk Pit is also proposing to pay $1,562.50 per month to the SBA as adequate protection—an amount that approximates the monthly interest accrual (at 3.75% per annum) on a loan whose outstanding principal amount is roughly equal to the $500,000 that the SBA originally extended. If the SBA's loan is oversecured, then these payments will help keep maintain the SBA's oversecured status as the SBA's claim accrues postpetition interest under section 506(b) of the Bankruptcy Code. Otherwise, these payments will be recharacterized as payments of principal. The other secured parties are all unsecured or severely undersecured (due to the SBA's senior lien) and therefore should not receive postpetition interest payments.

---

[10]  Section 525 of the Bankruptcy Code prohibits a governmental unit from refusing to renew a license to a debtor on the grounds that the debtor "has not paid a debt *that is dischargeable*." 11 U.S.C. § 525(a) (emphasis added). However, there is at least a colorable view that The Jerk Pit's sales tax debt is non-dischargeable because Maryland law treats a vendor as a "trustee for the State." Maryland Tax Code § 11-401(a); *cf. Begier v. IRS*, 496 U.S. 53 (1990) (holding that payments on federal "trust fund taxes" from a debtor's general account are not transfers of "property of the debtor" where debtor holds funds in trust for the government). Accordingly, The Jerk Pit considers it prudent to pay at least the sales and employment taxes before seeking license renewals from the county board.

# CONCLUSION

44.     The relief proposed by The Jerk Pit will adequately protect the interests of secured creditors, and all stakeholders will benefit from College Park location's survival as a going concern. For the reasons set forth in this Motion, the Court should approve The Jerk Pit's limited use the cash collateral so that the business can remain in operation and the expedited timeline of subchapter V can play out.

*[Remainder of page intentionally blank]*

Upon the foregoing Motion, the Jerk Pit respectfully requests that the Court (a) enter the Proposed Interim Order, granting this Motion on an interim basis and scheduling a hearing to consider the Motion on a final basis, (b) at that hearing, enter the Proposed Final Order granting this Motion on a final basis, and (c) grant such other relief as is just and proper.

Dated: May 28, 2025
Washington, D.C.

Respectfully submitted,

*/s/ John Colan*

John Colan (D.C. Bar No. 1011310)
SINOBERG RAFT
1754 Corcoran Street NW, Apt 56R
Washington, DC  20009
Telephone: 1 (804) 513-1566
Email:      John.Colan@SinobergRaft.com
*Proposed Counsel to the Debtors*

Lisa Laukitis (*pro hac vice* pending)
Benjamin M. Schak (*pro hac vice* pending)
Avi Taub (*pro hac vice* pending)
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Telephone: 1 (212) 530-5000
Email:      LLaukitis@Milbank.com
            BSchak@Milbank.com
            ATaub@Milbank.com
*Proposed Counsel to The Jerk Pit, LLC*

# Exhibit A-1 to Cash Collateral Motion

# Proposed Interim Order

# United States Bankruptcy Court
## for the District of Columbia

| | |
|---|---|
| *In re* | Case No. 25-00097 (ELG) |
| **Lisa Nash** d/b/a The Jerk Pit *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

# Interim Order (I) Authorizing
# The Jerk Pit, LLC to Use Cash Collateral
# and (II) Granting Adequate Protection

---

[1] The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the federal tax identification number and address of each one, are Lisa Nash (xxx-xx-2750, at 6510 Park Hall Drive, Laurel, MD 20707); The Jerk Pit, LLC (56-2486016, at 9078 Baltimore Ave., College Park, MD 20740); and Lime Cay Inc. (99-3280762, at 2436 18th St. NW, Washington, DC 20009).

Upon the motion (the "***Motion***"), of The Jerk Pit, LLC ("***The Jerk Pit***") for entry of an interim order (this "***Interim Order***") authorizing the use of cash collateral[2] and granting adequate protection; and the Court having jurisdiction to decide the Motion and to enter this Interim Order pursuant to 28 U.S.C. § 1334; and these chapter 11 cases having been referred to this Court pursuant to 28 U.S.C. § 157(a) by Local Bankruptcy Rule 5011-1(a) of the Rules of the United States District Court for the District of Columbia (Jan. 2024); and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, consistent with Bankruptcy Rules 2002 and 4001, any applicable Local Bankruptcy Rules and any applicable scheduling order of this Court, such notice being adequate and appropriate under the circumstances; and after notice and a hearing, as defined in section 102 of the Bankruptcy Code; and the Court having determined that the legal and factual bases set forth in the Motion and in the record establish just cause for entry of this Interim Order and include sufficient content to satisfy Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2; and it appearing that entry of this Interim Order on an emergency basis is in the best interests of the Debtors' estates, and that the limited interim relief set forth herein is justified to avoid immediate and irreparable harm to the Debtors' estates; it is hereby **ORDERED** that:

1.       The Court finds that sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), because The Jerk Pit's estate will be immediately and irreparably harmed in the absence of this Interim Order. Specifically, the Court finds that, if this Interim Order were not to become effective immediately upon its entry, The Jerk Pit's remaining business, which is presently under the management of the Debtors as debtors in possession, would be unable to continue in operation, to maintain business relationships with vendors and suppliers, to make payroll, to satisfy other operational needs, and to fund administrative expenses in these Chapter 11 Cases, all to the detriment of the estate and its stakeholders. Notwithstanding

---

[2]      As used in this Interim Order, "cash collateral" means all cash collateral, as defined in section 363(a) of the Bankruptcy Code, held by The Jerk Pit.

Bankruptcy Rules 6004(h) or any other provision of the Bankruptcy Rules or Local Rules, the terms of this Interim Order shall be immediately effective and enforceable upon its entry.

2.      The Jerk Pit is hereby authorized to use cash collateral in accordance with this Interim Order.

3.      The Court finds that the following terms are sufficient to protect each of (1) the U.S. Small Business Administration (the "***SBA***"), (2) Washington Area Community Investment Fund, (3) Celtic Bank, (4) Square Financial Services, Inc., (5) WebBank, (6) Capitalize Group LLC, (7) First Data Merchant Services LLC, (8) Fox Funding Group LLC, and (9) Parafin, Inc. (collectively, the "***Prepetition Secured Parties***") against diminution of value of their respective interests in collateral acquired by the Debtors before commencement of the applicable Chapter 11 Case (the "***Prepetition Collateral***"), in which they may have valid, enforceable, non-avoidable interests (the "***Prepetition Interests***"), including any receivables that constitute Prepetition Collateral (the "***Prepetition Receivables***") and any cash held or received by The Jerk Pit that constitutes traceable proceeds of Prepetition Receivables:

   a. The Jerk Pit shall pay $1,562.50 to the SBA on or before the last business day of each calendar month (the "***Adequate Protection Payments***"), which shall constitute (i) a payment of postpetition interest to the extent allowable under the Bankruptcy Code or (ii) a reduction of principal otherwise, which shall be without any prepayment penalty or similar charge.

   b. Each Prepetition Secured Party is hereby granted an allowable administrative claim (the "***Diminution Claim***"), with priority over all other administrative claims, against The Jerk Pit, in the amount of (i) diminution in value of its respective valid, perfected, unavoidable interest in any Debtor's assets, resulting from The Jerk Pit's use of such assets during its Chapter 11 Case, *minus* (ii) the amount properly chargeable to such interests under section 506(c) of the Bankruptcy Code.

   c. Each Prepetition Secured Party is hereby granted (without need to execute any mortgages, security agreements, pledge agreements, financing statements or other documents) a valid, perfected security interest (the "***Adequate Protection Liens***") in all receipts and receivables that arise from The Jerk Pit's business on or after the commencement of its Chapter 11 Case (collectively, the "***Postpetition Receivables***") and any traceable proceeds of Postpetition Receivables (with the Postpetition Receivables, the "***Adequate Protection Collateral***"). The Adequate Protection Liens shall secure no claims other than

the Prepetition Secured Parties' respective Diminution Claims, in each case to the extent allowed.

4.      To the extent that any person has a valid, perfected prepetition security interest or other property interest in any Adequate Protection Collateral (an "***Other Interest***"), the Adequate Protection Liens shall be junior in priority to such Other Interest. The various Prepetition Secured Parties' respective Adequate Protection Liens in Adequate Protection Collateral shall carry the same priorities as their respective interests in analogous Prepetition Collateral. For the avoidance of doubt, a Prepetition Interest extends to any Postpetition Receivables or proceeds thereof only to the extent that (a) the applicable security agreement or similar agreement provides that the Prepetition Interest extends to Postpetition Receivables, (b) the Postpetition Receivables are identifiable as proceeds, products, offspring, or profits of Prepetition Collateral, and (c) the Court does not order otherwise based on the equities of the case pursuant to section 552 of the Bankruptcy Code.

5.      The Prepetition Secured Parties' Diminution Claims, Adequate Protection Liens and the Prepetition Interests shall be junior in priority to a carve-out (the "***Carve-Out***") consisting of (a) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717; (b) all reasonable fees incurred by a trustee under sections 1104, 1183 or 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time (whether by interim order, final order or otherwise) all unpaid fees and expenses incurred by persons or firms employed by The Jerk Pit pursuant to sections 327, 328 or 363 of the Bankruptcy Code; and (d) to the extent allowed at any time (whether by interim order, final order or otherwise) all unpaid fees and expenses incurred by persons or firms employed by a trustee described in clause (b); *provided* that the amounts described in clause (b) and (d) shall not except $4,000.

6.      For the avoidance of doubt, the Adequate Protection Liens shall not extend to any causes of action under chapter 5 of the Bankruptcy Code or similar law (each such action, an "***Avoidance Action***"), to any proceeds of an Avoidance Action, or to any property that is recovered or unencumbered as the result of an Avoidance Action.

7.      Without limiting the automatic stay of section 362 of the Bankruptcy Code, no Prepetition Secured Party shall take any action with the effect or intent of impairing The Jerk Pit's rights or practical ability to receive payment on account of any Prepetition Receivables or Postpetition Receivables, including by directing any payment processor to freeze any account or to transfer any funds to any Prepetition Secured Party. Regardless of any notice presented by a Prepetition Secured Party to date or in the future, the Debtors' payment processors are authorized and directed to pay to The Jerk Pit the full amount of all Prepetition Receivables and Postpetition Receivables as they become payable to The Jerk Pit in the ordinary course of business, subject to the ordinary-course withholding of transaction fees.

8.      Nothing in the Motion or this Interim Order shall in any way limit, subordinate or constitute a waiver of any rights or priorities of claimants with trust rights under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. § 499a *et seq.* ("***PACA***") or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. § 181 *et seq.* ("***PASA***"), or in any way to grant liens or other rights in the res of any PACA trust or PASA trust in a manner that is contrary to PACA or PASA. For the avoidance of doubt, all parties' rights to object to the priority, validity, amount or extent of any trust under PACA or PASA are fully preserved.

9.      Nothing in the Motion or this Interim Order (a) constitutes a finding or ruling that any purported security interest or other purported interest in property is valid, senior, enforceable, prior, perfected or non-avoidable, or that any claim is valid, enforceable or non-avoidable, (b) shall prejudice the rights of any party (including the Debtors) to (i) challenge the validity, priority, enforceability, seniority, perfection or extent of any such security interest, property interest or claim or (ii) seek to avoid or recharacterize any such interest or claim, or (c) shall be understood to lift or alter the automatic stay with respect to the Prepetition Liens, the Prepetition Collateral or the Prepetition Receivables.

10.      The rights of the Debtors are reserved to (a) seek further use of Prepetition Collateral on any terms and conditions, (b) seek to apply any Adequate Protection Payments against principal of the SBA's prepetition loan, (c) charge expenses against Prepetition Collateral

(or Adequate Protection Liens) pursuant to section 506(c) of the Bankruptcy Code, (d) assert rights under the equitable doctrine of marshaling or (e) assert rights under the "equities of the case" exceptions of section 522 of the Bankruptcy Code.

11.     Except as explicitly provided, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders or other person.

12.     The authorization to use cash collateral pursuant to this Interim Order shall terminate upon the earlier of (a) effectiveness of an order disposing of the Motion on a final basis or (b) conversion of The Jerk Pit's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; *provided* that the dismissal of The Jerk Pit's Chapter 11 Case or the termination or lapse of authority to use cash collateral shall not impair The Jerk Pit's authorization to pay the Carve-Out.

13.     The Debtors and their agents are authorized to take all steps necessary or appropriate to carry out this Interim Order.

14.     The final hearing on the Motion shall be held on _____, 2025, at _____ (ET). The Debtors shall provide notice of the final hearing, the Motion, and this Interim Order in accordance with Bankruptcy Rule 2002, to the extent the Debtors have not already done so. Any objections or responses to entry of relief on a final basis shall be filed and served on proposed counsel to the Debtors, in accordance with the Bankruptcy Rules and the Local Bankruptcy Rules, on or before _____, 2025.

15.     The Court will retain jurisdiction over all matters arising from or related to the implementation, interpretation or enforcement of this Interim Order.

**Presented by:**

*/s/ John Colan*
John Colan (D.C. Bar No. 1011310)
Sɪɴᴏʙᴇʀɢ Rᴀꜰᴛ
1754 Corcoran Street NW, Apt 56R
Washington, DC  20009
Telephone: 1 (804) 513-1566
Email:     John.Colan@SinobergRaft.com

Lisa Laukitis (*pro hac vice* pending)
Benjamin M. Schak (*pro hac vice* pending)
Avi Taub (*pro hac vice* pending)
Mɪʟʙᴀɴᴋ LLP
55 Hudson Yards
New York, NY  10001
Telephone: 1 (212) 530-5000
Email:     LLaukitis@Milbank.com
           BSchak@Milbank.com
           ATaub@Milbank.com

**Copies to:** All counsel of record via ECF

## EXHIBIT A-2 TO CASH COLLATERAL MOTION

## PROPOSED FINAL ORDER

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| *In re* | Case No. 25-00097 (ELG) |
| LISA NASH d/b/a The Jerk Pit *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

# FINAL ORDER (I) AUTHORIZING
# THE JERK PIT, LLC TO USE CASH COLLATERAL
# AND (II) GRANTING ADEQUATE PROTECTION

---

[1]    The Debtors in these chapter 11 cases (the "***Chapter 11 Cases***"), along with the federal tax identification number and address of each one, are Lisa Nash (xxx-xx-2750, at 6510 Park Hall Drive, Laurel, MD 20707); The Jerk Pit, LLC (56-2486016, at 9078 Baltimore Ave., College Park, MD 20740); and Lime Cay Inc. (99-3280762, at 2436 18th St. NW, Washington, DC 20009).

Upon the motion (the "***Motion***"), of The Jerk Pit, LLC ("***The Jerk Pit***") for entry of a final order (this "***Final Order***") authorizing the use of cash collateral[2] and granting adequate protection; and the Court having jurisdiction to decide the Motion and to enter this Final Order pursuant to 28 U.S.C. § 1334; and these chapter 11 cases having been referred to this Court pursuant to 28 U.S.C. § 157(a) by Local Bankruptcy Rule 5011-1(a) of the Rules of the United States District Court for the District of Columbia (Jan. 2024); and consideration of the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, consistent with Bankruptcy Rules 2002 and 4001, any applicable Local Bankruptcy Rules and any applicable scheduling order of this Court, such notice being adequate and appropriate under the circumstances; and after notice and a hearing, as defined in section 102 of the Bankruptcy Code; and the Court having determined that the legal and factual bases set forth in the Motion and in the record establish just cause for entry of this Final Order and include sufficient content to satisfy Bankruptcy Rule 4001(b)(1)(B) and Local Bankruptcy Rule 4001-2; it is hereby **ORDERED** that:

1.      The Court finds that, if this Final Order were not to become effective immediately upon its entry, The Jerk Pit's remaining business, which is presently under the management of the Debtors as debtors in possession, would be unable to continue in operation, to maintain business relationships with vendors and suppliers, to make payroll, to satisfy other operational needs, and to fund administrative expenses in these Chapter 11 Cases, all to the detriment of the estate and its stakeholders. Notwithstanding Bankruptcy Rules 6004(h) or any other provision of the Bankruptcy Rules or Local Rules, the terms of this Final Order shall be immediately effective and enforceable upon its entry.

2.      The Jerk Pit is hereby authorized to use all cash collateral in accordance with this Final Order.

---

[2]     As used in this Final Order, "cash collateral" means all cash collateral, as defined in section 363(a) of the Bankruptcy Code, held by The Jerk Pit.

3.      The Court finds that the following terms are sufficient to protect each of (1) the
U.S. Small Business Administration (the "***SBA***"), (2) Washington Area Community Investment
Fund, (3) Celtic Bank, (4) Square Financial Services, Inc., (5) WebBank, (6) Capitalize Group
LLC, (7) First Data Merchant Services LLC, (8) Fox Funding Group LLC, and (9) Parafin, Inc.
(collectively, the "***Prepetition Secured Parties***") against diminution of value of their respective
interests in collateral acquired by the Debtors before commencement of the applicable Chapter 11
Case (the "***Prepetition Collateral***"), in which they may have valid, enforceable, non-avoidable
interests (the "***Prepetition Interests***"), including any receivables that constitute Prepetition
Collateral (the "***Prepetition Receivables***") and any cash held or received by The Jerk Pit that
constitutes traceable proceeds of Prepetition Receivables:

   a.   The Jerk Pit shall pay $1,562.50 to the SBA on or before the last business day
        of each calendar month (the "***Adequate Protection Payments***"), which shall
        constitute (i) a payment of postpetition interest to the extent allowable under
        the Bankruptcy Code or (ii) a reduction of principal otherwise, which shall be
        without any prepayment penalty or similar charge.

   b.   Each Prepetition Secured Party is hereby granted an allowable administrative
        claim (the "***Diminution Claim***"), with priority over all other administrative
        claims, against The Jerk Pit, in the amount of (i) diminution in value of its
        respective valid, perfected, unavoidable interest in any Debtor's assets,
        resulting from The Jerk Pit's use of such assets during its Chapter 11 Case,
        *minus* (ii) the amount properly chargeable to such interests under
        section 506(c) of the Bankruptcy Code.

   c.   Each Prepetition Secured Party is hereby granted (without need to execute
        any mortgages, security agreements, pledge agreements, financing statements
        or other documents) a valid, perfected security interest (the "***Adequate
        Protection Liens***") in all receipts and receivables that arise from The Jerk Pit's
        business on or after the commencement of its Chapter 11 Case (collectively,
        the "***Postpetition Receivables***") and any traceable proceeds of Postpetition
        Receivables (with the Postpetition Receivables, the "***Adequate Protection
        Collateral***"). The Adequate Protection Liens shall secure no claims other than
        the Prepetition Secured Parties' respective Diminution Claims, in each case
        to the extent allowed.

4.      To the extent that any person has a valid, perfected prepetition security interest or
other property interest in any Adequate Protection Collateral (an "***Other Interest***"), the Adequate
Protection Liens shall be junior in priority to such Other Interest. The various Prepetition Secured
Parties' respective Adequate Protection Liens in Adequate Protection Collateral shall carry the

same priorities as their respective interests in analogous Prepetition Collateral. For the avoidance of doubt, a Prepetition Interest extends to any Postpetition Receivables or proceeds thereof only to the extent that (a) the applicable security agreement or similar agreement provides that the Prepetition Interest extends to Postpetition Receivables, (b) the Postpetition Receivables are identifiable as proceeds, products, offspring, or profits of Prepetition Collateral, and (c) the Court does not order otherwise based on the equities of the case pursuant to section 552 of the Bankruptcy Code.

5.       The Prepetition Secured Parties' Diminution Claims, Adequate Protection Liens and the Prepetition Interests shall be junior in priority to a carve-out (the "***Carve-Out***") consisting of (a) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717; (b) all reasonable fees incurred by a trustee under sections 1104, 1183 or 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time (whether by interim order, final order or otherwise) all unpaid fees and expenses incurred by persons or firms employed by The Jerk Pit pursuant to sections 327, 328 or 363 of the Bankruptcy Code; and (d) to the extent allowed at any time (whether by interim order, final order or otherwise) all unpaid fees and expenses incurred by persons or firms employed by a trustee described in clause (b); *provided* that the amounts described in clause (b) and (d) shall not except $4,000.

6.       For the avoidance of doubt, the Adequate Protection Liens shall not extend to any causes of action under chapter 5 of the Bankruptcy Code or similar law (each such action, an "***Avoidance Action***"), to any proceeds of an Avoidance Action, or to any property that is recovered or unencumbered as the result of an Avoidance Action.

7.       Without limiting the automatic stay of section 362 of the Bankruptcy Code, no Prepetition Secured Party shall take any action with the effect or intent of impairing The Jerk Pit's rights or practical ability to receive payment on account of any Prepetition Receivables or Postpetition Receivables, including by directing any payment processor to freeze any account or to transfer any funds to any Prepetition Secured Party. Regardless of any notice presented by a

Prepetition Secured Party to date or in the future, the Debtors' payment processors are authorized and directed to pay to The Jerk Pit the full amount of all Prepetition Receivables and Postpetition Receivables as they become payable to The Jerk Pit in the ordinary course of business, subject to the ordinary-course withholding of transaction fees.

8.      Nothing in the Motion, the Interim Order or this Final Order shall in any way limit, subordinate or constitute a waiver of any rights or priorities of claimants with trust rights under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("***PACA***") or the Packers and Stockyards Act of 1921, as amended, 7 U.S.C. §§ 181 *et seq.* ("***PASA***"), or in any way to grant liens or other rights in the res of any PACA trust or PASA trust in a manner that is contrary to PACA or PASA. For the avoidance of doubt, all parties' rights to object to the priority, validity, amount or extent of any trust under PACA or PASA are fully preserved.

9.      Nothing in the Motion, the Interim Order or this Final Order (a) constitutes a finding or ruling that any purported security interest or other purported interest in property is valid, senior, enforceable, prior, perfected or non-avoidable, or that any claim is valid, enforceable or non-avoidable, (b) shall prejudice the rights of any party (including the Debtors) to (i) challenge the validity, priority, enforceability, seniority, perfection or extent of any such security interest, property interest or claim or (ii) seek to avoid or recharacterize any such interest or claim, or (c) shall be understood to lift or alter the automatic stay with respect to the Prepetition Liens, the Prepetition Collateral or the Prepetition Receivables.

10.     The rights of the Debtors are reserved to (a) seek further use of Prepetition Collateral on any terms and conditions, (b) seek to apply any Adequate Protection Payments against principal of the SBA's prepetition loan, (c) charge expenses against Prepetition Collateral (or Adequate Protection Liens) pursuant to section 506(c) of the Bankruptcy Code, (d) assert rights under the equitable doctrine of marshaling or (e) assert rights under the "equities of the case" exceptions of section 522 of the Bankruptcy Code.

11.     Except as explicitly provided, this Final Order does not create any rights for the benefit of any third party, creditor, equity holders or other person.

12.     The authorization to use cash collateral pursuant to this Final Order shall terminate upon conversion of The Jerk Pit's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; *provided* that the dismissal of The Jerk Pit's Chapter 11 Case or termination or lapse of authority to use cash collateral shall not impair The Jerk Pit's authorization to pay the Carve-Out.

13.     The Debtors and their agents are authorized to take all steps necessary or appropriate to carry out this Final Order.

14.     The Court will retain jurisdiction over all matters arising from or related to the implementation, interpretation or enforcement of this Final Order.

**Presented by:**

*/s/ John Colan*
John Colan (D.C. Bar No. 1011310)
Sɪɴᴏʙᴇʀɢ Rᴀғᴛ
1754 Corcoran Street NW, Apt 56R
Washington, DC  20009
Telephone: 1 (804) 513-1566
Email:      John.Colan@SinobergRaft.com

Lisa Laukitis (*pro hac vice* pending)
Benjamin M. Schak (*pro hac vice* pending)
Avi Taub (*pro hac vice* pending)
Mɪʟʙᴀɴᴋ LLP
55 Hudson Yards
New York, NY  10001
Telephone: 1 (212) 530-5000
Email:      LLaukitis@Milbank.com
              BSchak@Milbank.com
              ATaub@Milbank.com

**Copies to:** All counsel of record via ECF

# EXHIBIT B TO CASH COLLATERAL MOTION

## CASH-FLOW FORECAST

# EXHIBIT C-1 TO CASH COLLATERAL MOTION

## LOAN TRANSACTIONS

| | **Small Business Administration** | **Washington Area Community Investment Fund** | **Celtic Bank d/b/a Stripe Capital** | **Square Financial Services, Inc.** | **WebBank d/b/a Toast Capital** |
|---|---|---|---|---|---|
| **Borrower** | The Jerk Pit | The Jerk Pit | The Jerk Pit | The Jerk Pit | Lime Cay |
| **Transaction date** | 2/9/2022 | 2024 | 6/5/2024 | 12/27/2024 | 11/26/2024 |
| **Term** | 30 years | | 18 months | 18 months | 90-150 days |
| **Interest rate** | 3.75% after 2 years | 7.75% | N/A ($3,418 OID) | N/A ($3,645 OID) | N/A ($965 OID) |
| **Initial loan amount** | $500,000 | $48,500 | $24,918 | $27,000 | $20,265 |
| **Outstanding principal amount** | ~$521,074 | ~$35,965 | Subject to calculation | Subject to calculation | Subject to calculation |
| **Periodic payment** | $2,575 per month | $2,251 per month | $2,768.67 every 60 days | $1,702.50 every 60 days | 13.2% of "Toast" receipts |
| **Collateral** | Tangible and intangible personal property | Subject to further diligence | Receivables, "Stripe Account," proceeds, and "all business assets" | None | Receivables and proceeds |

EXHIBIT C-2 TO CASH COLLATERAL MOTION

RECEIVABLES TRANSACTIONS

| | Capitalize Group | First Data d/b/a Clover | Fox Funding | Parafin | Parafin |
|---|---|---|---|---|---|
| **Borrower/ Seller** | The Jerk Pit Lime Cay | The Jerk Pit | The Jerk Pit | The Jerk Pit | Lime Cay |
| **Transaction date** | 10/8/2024 | 7/23/2024 | 9/23/2024 | 8/13/2024 | 12/25/2024 |
| **% of receivables purchased** | 10.00% | 25.00% | 6.95% | 30.00% | 15.00% |
| **Net funding amount**[1] | $74,400.00 | $22,253.00 | $52,505.00 | $150,000.00 | $9,100.00 |
| **Scheduled payments** | $120,000.00 | $27,817.00 | $79,750.00 | $174,915.00 | $10,695.00 |
| **Recurring remittance** | $1,043.48 per bus. day | Percentage-based | $759.52 per bus. day | To be estimated by Parafin | To be estimated by Parafin |
| **Expected term (appx.)** | 5 months + 2 weeks | | 5 months | | |
| **Return on capital** | 61% | 25% | 52% | 17% | 18% |
| **Collateral** | Accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory and proceeds | Payment card receivables | Accounts and proceeds | Future receivables and proceeds | Future receivables and proceeds |

---

[1]  In some cases, net funding amount includes a payoff of a previous cash advance. This chart should not be understood as a concession that any such payoff constituted bona fide value to the Debtors.

# EXHIBIT D TO CASH COLLATERAL MOTION

## SBA FINANCING STATEMENT

# Exhibit E to Cash Collateral Motion

# SBA Loan Agreement